THORPE SHWER, P.C.

**THORPE SHWER, P.C.**
William L. Thorpe (No. 005641)
Jamie Gill Santos (No. 026251)
3200 North Central Avenue, Suite 1560
Phoenix, Arizona  85012-2441
Telephone:  (602) 682-6100
Email:  docket@thorpeshwer.com
Email:  wthorpe@thorpeshwer.com
Email:  jsantos@thorpeshwer.com

**RIVKIN RADLER, LLP**
Barry I. Levy (to be admitted *pro hac vice*)
Max Gershenoff (to be admitted *pro hac vice*)
Steven Henesy (to be admitted *pro hac vice*)
Michael Vanunu (to be admitted *pro hac vice*)
926 RXR Plaza
Uniondale, New York 11556
Telephone: (516) 357-3000
Email: barry.levy@rivkin.com
Email: max.gershenoff@rivkin.com
Email: steven.henesy@rivkin.com
Email: michael.vanunu@rivkin.com

*Counsel for Plaintiffs Government Employees Insurance Co.,*
*GEICO Indemnity Co., GEICO General Insurance Co., and*
*GEICO Casualty Co.*

## IN THE UNITED STATES DISTRICT COURT

## FOR DISTRICT OF ARIZONA

| | |
|---|---|
| Government Employees Insurance Co., GEICO Indemnity Co.; GEICO General Insurance Company and GEICO Casualty Co., | NO. |
| Plaintiffs, | |
| v. | **COMPLAINT** |
| A & E Solheim, LLC d/b/a A & E Auto Glass; Eric A. Solheim; and Anna M. Solheim, | |
| Defendants. | |

9078113

Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. (collectively "GEICO" or "Plaintiffs"), as and for their Complaint against the Defendants, hereby allege as follows:

## INTRODUCTION

1.     This action seeks to terminate an ongoing fraudulent scheme committed against GEICO and, more broadly, the Arizona automobile insurance industry, and to recover more than $1,900,000.00 that the Defendants have stolen from GEICO through the submission of thousands of fraudulent insurance claims seeking reimbursement for: (i) windshield replacement services (the "Glass Services"); (ii) the installation of windshield parts – including moldings, weather strips, sensors and retainers - attendant to the windshield replacements (the "Glass Parts"); and (iii) Advanced Driver Assistance System ("ADAS") re-calibration services (the "ADAS Services") allegedly provided to individuals who were eligible for glass repair/replacement coverage under comprehensive automobile insurance policies issued by GEICO ("Insureds").

2.     In addition to money damages, GEICO seeks a declaration that it is not legally obligated to pay reimbursement of more than $90,000.00 in outstanding claims for Glass Services and Glass Parts that have been submitted or caused to be submitted by the Defendants through Defendant A & E Solheim, LLC d/b/a A & E Auto Glass ("A&E Auto"), because the claims were fraudulent in that they:

    (i)    involved charges for fraudulent and illusory Glass Services, Glass Parts, and ADAS Services that were never performed and/or provided in the first instance; and

    (ii)    involved the submission of fraudulent and fabricated purchase invoices in order to substantiate their charges for the Glass Services and Glass Parts

2

THORPE SHWER, P.C.

and to create the appearance that the Defendants had legitimately acquired the Glass Parts, when in fact they did not.

3.     As more fully described in this Complaint, Defendants Eric A. Solheim ("E. Solheim"), Anna M. Solheim ("A. Solheim", and collectively with E. Solheim, the "Solheims"), and A&E Auto (collectively the "Defendants") engineered a scheme to create the appearance that A&E Auto performed legitimate Glass Services and provided legitimate Glass Parts to Insureds in order to submit invoices to GEICO for payment under the Insureds' motor vehicle insurance policies. In reality, the Solheims used A&E Auto as a vehicle through which they could submit a massive amount of fraudulent billing for goods and services they never performed and/or provided in the first instance.

4.     The Defendants fall into the following categories:

(i)     Defendant A&E Auto is an Arizona limited liability company that was used by the Solheims as a vehicle to submit the fraudulent billing to GEICO and other automobile insurers seeking payment for Glass Services and Glass Parts.

(ii)    Defendants E. Solheim and A. Solheim are the operators and sole members of A&E Auto, and the individuals who orchestrated and implemented the fraudulent scheme described in this Complaint.

5.     As discussed below, the Defendants at all relevant times have known that the charges for the Glass Services and Glass Parts that they submitted, or caused to be submitted, to GEICO were fraudulent in that they:

(i)     involved charges for illusory Glass Services, Glass Parts, and ADAS Services that were never performed and/or provided in the first instance; and

(ii)    involved the submission of fabricated purchase invoices in order to substantiate the Defendants' charges for the Glass Services and Glass Parts and to create the appearance that the Defendants had legitimately acquired the Glass Parts, when in fact they did not.

3

6.     As such, the Defendants do not now have – and never had – any right to be compensated for the Glass Services and Glass Parts that they billed to GEICO.

7.     The chart annexed hereto as Exhibit "1" sets forth a representative sample of the more than 2,800 fraudulent claims that have been identified to-date that the Defendants submitted, or caused to be submitted, to GEICO by means of wire transmission in interstate commerce.

8.     The Defendants' fraudulent scheme began as early as late 2017 and has continued uninterrupted through the present day.

9.     As a result of the Defendants' scheme, GEICO has incurred damages of more than $1,900,000.00.

## THE PARTIES

**I.     Plaintiffs**

10.     Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. are Maryland corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in the state of Arizona.

**II.     Defendants**

11.     Defendant A&E Auto is an Arizona limited liability company. A&E Auto was organized in Arizona on or about February 28, 2003, and its members have been the Solheims at all relevant periods of time.  A&E Auto was and continues to be used by the

THORPE SHWER, P.C.

4

9078113

Solheims as a vehicle to submit to GEICO and other automobile insurers thousands of fraudulent claims for Glass Services and Glass Parts.

12.     Defendant A. Solheim resides in and is a citizen of Arizona. A. Solheim, together with E. Solheim, owned and operated A&E Auto, which they used as a vehicle to submit thousands of fraudulent claims for Glass Services and Glass Parts to GEICO.

13.     Defendant E. Solheim resides in and is a citizen of Arizona. E. Solheim, together with A. Solheim, owned and operated A&E Auto, which they used as a vehicle to submit thousands of fraudulent claims for Glass Services and Glass Parts to GEICO.

### JURISDICTION AND VENUE

14.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states. Pursuant to 28 U.S.C. §1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") Act)) because they arise under the laws of the United States.  In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. §1367.

15.     Venue in this District is appropriate pursuant to 28 U.S.C. §1391, as the District of Arizona is the District (i) where one or more of the Defendants reside, and (ii) a substantial amount of the activities forming the basis of the Complaint occurred.

THORPE SHWER, P.C.

9078113

THORPE SHWER, P.C.

## **ALLEGATIONS COMMON TO ALL CLAIMS**

16.     Plaintiff GEICO is an insurance company licensed and authorized to do business in the State of Arizona. GEICO underwrites automobile insurance in Arizona.

**I.      Automobile Insurance and Reimbursement for Glass Services**

17.     Though not required, a large percentage of Arizona automobile owners carry comprehensive insurance coverage. By law, any insurer who provides comprehensive coverage for a motor vehicle is required to provide the Insured with an option to cover the repair or replacement of damage to any safety equipment, which includes windshields. See Ariz. Rev. St. § 20-264.

18.     In the event of damage to the windshield of an Insured vehicle with comprehensive insurance coverage and complete safety equipment coverage, Arizona law requires insurers to replace or repair the damaged windshield without application of a deductible. See Ariz. Rev. St. § 20-264.

19.     An Insured can assign his or her right to complete safety equipment coverage benefits – i.e., coverage for windshield repair or replacement – to his/her preferred windshield repair/replacement shop in exchange for the shop's performance of the repair or replacement services.

20.     Then, pursuant to an assignment of benefits given by the Insured to the shop, the shop can perform the work, and submit its invoice for the repair or replacement, together with the work order number, directly to GEICO for payment.  The submission is made using an electronic billing or facsimile transmission system in which the shop's invoice and supporting documents (e.g. dealership invoices for glass and parts purchased

6

9078113

by the shop) is transmitted to GEICO via interstate wire transfer to its' third-party administrator located in Columbus, Ohio.

21.     Arizona law generally permits automobile insurers such as GEICO only thirty (30) days from their receipt to handle a claim seeking payment for windshield repair and/or replacement. See, e.g., Ariz. Rev. St. § 20-462(A).  If insurers such as GEICO do not pay the claim within 30 days, or present some good reason for denying or investigating the claim, they can be liable to the Insured or the Insured's assignee for interest at the legal rate from the date the claim is received. See id. While the 30-day claims handling period helps to ensure that legitimate claims are paid in a timely manner, it also creates perverse incentives for glass shops to engage in fraudulent practices, such as those  employed by the Defendants.

22.     GEICO receives hundreds of windshield repair or replacement claims from Arizona Insureds and shops on a daily basis.

23.     Upon information and belief, other Arizona automobile insurers similarly receive a very high volume of windshield repair and replacement claims each day.

24.     Glass shops who engage in the types of fraudulent practices employed by the Defendants count on the volume of windshield repair and replacement claims, coupled with the  limited amount of time in which insurers have to handle those claims, to shield their activity from timely discovery.

25.     In response to fraudulent windshield repair and replacement practices within Arizona, the legislature amended the Unfair Practices and Frauds Article of

9078113

Arizona's Insurance Statutes to specifically identify and criminalize unlawful auto glass repair. See Ariz. Rev. St. §§ 20-463.01; 20-466.01.

26.    In particular, Section 20-463.01 was amended, effective July 29, 2010, to specifically criminalize specific practices by the auto glass industry. See AZ House Committee Minutes, February 1, 2010, noting that "the bill contains a list of the most common fraudulent practices by the auto glass industry."

27.    Specifically, Arizona Statute § 20-463.01(A)(1)(a) provides that it is an unlawful practice for a person who sells or repairs auto glass to knowingly submit a false claim to an insurer for auto glass repair or replacement or for related services if the services were not provided.

28.    Other unlawful acts by an auto glass seller or repairer include: (i) falsely signing on behalf of a policyholder a work order, insurance assignment form, or other related form in order to submit a claim to an insurer; and (ii) misrepresenting to a policy holder the price of the proposed repairs or replacement being billed to the insurer. See Ariz. Rev. St. §§ 20-463.01.

29.    In Arizona, the submission of a claim seeking insurance reimbursement that is based in part on a fraudulent misrepresentation renders the entire claim fraudulent and not reimbursable.

II.    **The Defendants' Fraudulent Scheme**

30.    Defendants began operating in Arizona through A&E Auto many years ago.  Prior to 2018, A&E Auto had historically submitted a small number of claims to GEICO.  By way of example, in contrast to the 2,708 claims submitted to GEICO in 2018

9078113

seeking more than $1.85 million in payments, in 2017 A&E Auto submitted 299 claims to GEICO seeking approximately $176,000 in payments, and in 2016 A&E Auto submitted 254 claims to GEICO seeking approximately $115,000 in payments.

31.     Beginning in late 2017, the Defendants implemented a multi-tiered fraudulent scheme to generate thousands of fraudulent claims, and to bill GEICO for goods and services they never provided.  That fraudulent scheme continues uninterrupted to this day.

32.     In the claims identified in Exhibit "1", the Defendants were in most instances contacted by Insureds whose vehicles were claimed to have required either a replacement or repair of their windshields.

33.     Once an Insured contacted A&E Auto, either the Insured, A&E Auto or both contacted GEICO in order to advise GEICO of their intention to submit a claim for a windshield replacement, and obtain a claim number.

34.     Thereafter, A&E Auto typically scheduled a date and time for one of its technicians to meet each Insured at their shop or an alternative designated location (e.g. a home or office) in order to perform a windshield replacement.

35.     After the replacement of an Insured's windshield, the Defendants would electronically submit an invoice and supporting documentation to GEICO seeking reimbursement for the Glass Services and Glass Parts that were claimed to have provided/performed. As discussed below, the claims on Exhibit "1" were fraudulent in that they falsely represented to GEICO that the Glass Services and Glass Parts had been performed and/or provided, when in fact they had not been.

9

THORPE SHWER, P.C.

THORPE SHWER, P.C.

**A.  Fraudulent Billing for ADAS Services that were Never Performed in the First Instance**

36.     As set forth in Exhibit "1", in addition to the actual windshield repair or replacement, the A&E Auto invoices submitted to GEICO would many times represent that the Insured was provided with an ADAS recalibration service ("ADAS Service") and seek payment for that service from GEICO in an amount ranging from $250.00 to $300.00.

37.     Certain modern vehicles are equipped with various types of ADAS systems that will typically include a front-facing camera that is mounted on or near a windshield. The camera is used to help with specific types of ADAS systems with which vehicles are equipped, such as adaptive cruise control, forward collision warning, and lane departure warning systems ("LDWS").

38.     The type of ADAS system included with a vehicle – if any – depends on the year, make, model, and trim level of that particular vehicle.

39.     In a legitimate claim, the repair or replacement of a windshield may implicate the vehicle's ADAS system, and therefore require that the ADAS front-facing camera be re-calibrated.

40.     In a legitimate claim, ADAS system re-calibration is performed using devices such as the Pilkington Opti-Aim ("Opti-Aim"), which is a specific piece of equipment used by the technician to re-calibrate the vehicle's ADAS system following a windshield replacement.  Each Opti-Aim device is assigned a unique serial number by Pilkington, and the serial number appears on the report that the equipment generates in connection with the service.

10

THORPE SHWER, P.C.

41.     In support of their claims for the purported ADAS Services, the Defendants systematically submitted reports to GEICO allegedly generated by an Opti-Aim device bearing serial number AR343965.  In fact, the reports were fraudulent and the services were never performed as:

> (i)     Defendants have never owned nor had access to Opti-Aim recalibration equipment, including the Opti-Aim device bearing serial number AR343965; and
>
> (ii)    The Opti-Aim device bearing serial number AR was actually purchased in 2017 by a glass company located in Bozeman Montana known as Bozeman Glass Doctor,
>
> (iii)   The Opti-Aim device that Defendants claim to have used in Arizona has been used by Bozeman Glass Doctor in Montana since it was purchased.

A copy of the affidavit from the owner of Bozeman Glass Doctor is attached as Exhibit "2".

42.     The Defendants claim submissions seeking payment for ADAS Services also represented to GEICO that they provided ADAS Services to Insureds having a wide variety of vehicles, and included an Opti-Aim report representing re-calibration of the LDWS feature of that particular vehicle.  The Defendants' claim submissions were false, in addition to the fact that the Defendants never owned the equipment, because a large number of the vehicles on which ADAS Services were performed were not actually equipped with LDWS.

43.     In further keeping with the fact that the claims for ADAS Services identified in Exhibit "1" were fraudulent, the Insureds never authorized or consented to the performance of the ADAS Services, much less to the Defendants submission of claims seeking reimbursement against their insurance policies for the alleged services.

11

9078113

44.     For example, shortly before filing this Complaint, GEICO learned that the Defendants actually employed a practice in which they generate two (2) invoices in connection with each service call – including where the ADAS Service was claimed to have been performed.  Pursuant to Defendants' fraudulent practice, they:

> (i)     provide the Insured with an invoice that would not reference the ADAS Services, nor include a charge for those services; and

> (i)     submit a separate invoice to GEICO with a forged signature of the Insured, falsely indicating that the ADAS Services had been actually performed.

Representative examples of the contradictory invoices are attached to this Complaint as Exhibit "3".

45.     In addition, Defendants routinely submitted Opti-Aim reports that purported to bear the signature of the Insureds, when in fact, the reports were never actually signed by the Insureds, but rather, by Defendants and/or their employees. Defendants forged the Insureds' signatures to create the false appearance that: (i) the ADAS Services had actually been performed; and (ii) the Insureds had authorized those services.

46.     A review by GEICO of the Opti-Aim reports in connection with its investigation further confirmed that the ADAS Services were not actually performed – the reports indicate that:

> (i)     the ADAS Services were performed using the same calibration equipment on different vehicles at different locations (many miles apart) at or around the same time, and

> (ii)    the ADAS Services reportedly took five (5) minutes despite the fact that recalibrations, whether performed in a dynamic or static setting, generally take thirty (30) minutes to one (1) hour to perform.

THORPE SHWER, P.C.

12

9078113

Representative examples of the fraudulent Opti-Aim reports are attached to this Complaint as Exhibit "4".

47.  In all of the claims for ADAS Services identified in Exhibit "1", the Defendants falsely represented they were entitled to reimbursement for the purported ADAS Services despite the fact that:

> (i)  the vehicles were not equipped with LDWS or any other ADAS system requiring re-calibration;
>
> (ii)  the Insureds had not authorized or consented to the performance of the putative ADAS Services or the resulting submission of claims for reimbursement submitted to GEICO;
>
> (iii)  the Insureds had not signed the ADAS Receipt or any other document related to supposed ADAS re-calibration, nor had they authorized anyone to do so on their behalf; and
>
> (iv)  the purported ADAS Services were never performed in the first instance.

48.  For example:

> (i)  On May 8, 2018, an Insured named BL authorized A&E Auto to replace his vehicle's windshield and to submit a claim to GEICO for the replacement service.   The windshield replacement was performed on May 8, 2018. As of May 8, 2018, BL's vehicle was not equipped with LDWS, BL did not request or authorize any safety feature re-calibration services, and did not sign any report or receipt related to any purported calibration of any of his vehicle's safety features. Nonetheless, on May 18, 2018, the Defendants submitted a fraudulent claim to GEICO seeking reimbursement of $250.00 for an ADAS Service purportedly provided to BL's vehicle on May 8, 2018. The claim falsely represented that: (a) that A&E Auto had re-calibrated a non-existent LDWS system; and (b) that BL had signed an Opti-Aim Report following the purported re-calibration. In reality, no ADAS Service had been performed or authorized. Moreover, BL never signed the corresponding Opti-Aim Report or authorized anyone to do so on his behalf.
>
> (ii)  On April 9, 2018 an Insured named JL authorized A&E Auto to replace her vehicle's windshield and to submit a claim to GEICO for

THORPE SHWER, P.C.

13

9078113

the replacement service. The windshield replacement was performed on April 9, 2018. As of April 9, 2018, JL's vehicle was not equipped with LDWS, JL did not request or authorize any safety feature re-calibration services, and did not sign any report or receipt related to any purported calibration of any of her vehicle's safety features. Nonetheless, on April 14, 2018, the Defendants submitted a fraudulent claim to GEICO seeking reimbursement of $250.00 for an ADAS Service purportedly provided to JL's vehicle on April 9, 2018. The claim falsely represented that: (a) that A&E Auto had re-calibrated a non-existent LDWS system; and (b) that JL had signed an Opti-Aim Report following the purported re-calibration. In reality, no ADAS Service had been performed or authorized. Moreover, JL never signed the corresponding Opti-Aim Report or authorized anyone to do so on her behalf.

(iii)    On November 28, 2018, an Insured named EB authorized A&E Auto to replace his vehicle's windshield and to submit a claim to GEICO for the replacement service. The windshield replacement was performed on November 28, 2018. As of November 28, 2018, EB's vehicle was not equipped with LDWS, EB did not request or authorize any safety feature re-calibration services, and did not sign any report or receipt related to any purported calibration of any of his vehicle's safety features. Nonetheless, on December 6, 2018, the Defendants submitted a fraudulent claim to GEICO seeking reimbursement of $250.00 for an ADAS Service purportedly provided to EB's vehicle on November 28, 2018,. The claim falsely represented that: (a) that A&E Auto had re-calibrated a non-existent LDWS system; and (b) that EB had signed an Opti-Aim Report following the purported re-calibration. In reality, no ADAS Service had been performed or authorized. Moreover, EB never signed the corresponding Opti-Aim Report or authorized anyone to do so on his behalf.

(iv)    On October 16, 2018, an Insured named ER authorized A&E Auto to replace his vehicle's windshield and to submit a claim to GEICO for the replacement service. The windshield replacement was performed on October 16, 2018. As of October 16, 2018, ER's vehicle was not equipped with LDWS, ER did not request or authorize any safety feature re-calibration services, and did not sign any report or receipt related to any purported calibration of any of his vehicle's safety features. Nonetheless, on October 31, 2018, the Defendants submitted a fraudulent claim to GEICO seeking reimbursement of $250.00 for an ADAS Service purportedly provided to ER's vehicle on October 16, 2018,. The claim falsely

THORPE SHWER, P.C.

9078113

represented that: (a) that A&E Auto had re-calibrated a non-existent LDWS system; and (b) that ER had signed an Opti-Aim Report following the purported re-calibration. In reality, no ADAS Service had been performed or authorized. Moreover, ER never signed the corresponding Opti-Aim Report or authorized anyone to do so on his behalf.

(v)    On November 8, 2018, an Insured named RH authorized A&E Auto to replace his vehicle's windshield and to submit a claim to GEICO for the replacement service.   The windshield replacement was performed on November 8, 2018. As of November 8, 2018, RH's vehicle was not equipped with LDWS, RH did not request or authorize any safety feature re-calibration services, and did not sign any report or receipt related to any purported calibration of any of his vehicle's safety features. Nonetheless, on December 7, 2018, the Defendants submitted a fraudulent claim to GEICO seeking reimbursement of $250.00 for an ADAS Service purportedly provided to RH's vehicle on November 8, 2018,. The claim falsely represented that: (a) that A&E Auto had re-calibrated a non-existent LDWS system; and (b) that RH had signed an Opti-Aim Report following the purported re-calibration. In reality, no ADAS Service had been performed or authorized. Moreover, RH never signed the corresponding Opti-Aim Report or authorized anyone to do so on his behalf.

(vi)   On December 15, 2018, an Insured named JK authorized A&E Auto to replace his vehicle's windshield and to submit a claim to GEICO for the replacement service.   The windshield replacement was performed on December 15, 2018. As of December 15, 2018, JK's vehicle was not equipped with LDWS, JK did not request or authorize any safety feature re-calibration services, and did not sign any report or receipt related to any purported calibration of any of his vehicle's safety features. Nonetheless, on January 10, 2019, the Defendants submitted a fraudulent claim to GEICO seeking reimbursement of $250.00 for an ADAS Service purportedly provided to JK's vehicle on December 15, 2018. The claim falsely represented that: (a) that A&E Auto had re-calibrated a non-existent LDWS system; and (b) that JK had signed an Opti-Aim Report following the purported re-calibration. In reality, no ADAS Service had been performed or authorized. Moreover, JK never signed the corresponding Opti-Aim Report or authorized anyone to do so on his behalf.

(vii)  On December 6, 2018, an Insured named LFC authorized A&E Auto to replace his vehicle's windshield and to submit a claim to GEICO

15

THORPE SHWER, P.C.

1    for the replacement service.   The windshield replacement was
2    performed on December 6, 2018. As of December 6, 2018, LFC's
3    vehicle was not equipped with LDWS, LFC did not request or
4    authorize any safety feature re-calibration services, and did not sign
5    any report or receipt related to any purported calibration of any of
    his vehicle's safety features. Nonetheless, on December 15, 2018,
6    the Defendants submitted a fraudulent claim to GEICO seeking
7    reimbursement of $250.00 for an ADAS Service purportedly
    provided to LFC's vehicle on December 6, 2018. The claim falsely
8    represented that: (a) that A&E Auto had re-calibrated a non-existent
9    LDWS system; and (b) that LFC had signed an Opti-Aim Report
    following the purported re-calibration. In reality, no ADAS Service
10   had been performed or authorized. Moreover, LFC never signed the
    corresponding Opti-Aim Report or authorized anyone to do so on his
    behalf.

(viii)   On June 3, 2018, an Insured named AS authorized A&E Auto to
    replace her vehicle's windshield and to submit a claim to GEICO for
    the replacement service.   The windshield replacement was
    performed on June 3, 2018. As of June 3, 2018, AS's vehicle was
    not equipped with LDWS, AS did not request or authorize any safety
    feature re-calibration services, and did not sign any report or receipt
    related to any purported calibration of any of her vehicle's safety
    features. Nonetheless, on June 12, 2018, the Defendants submitted a
    fraudulent claim to GEICO seeking reimbursement of $250.00 for an
    ADAS Service purportedly provided to AS's vehicle on June 3,
    2018. The claim falsely represented that: (a) that A&E Auto had re-
    calibrated a non-existent LDWS system; and (b) that AS had signed
    an Opti-Aim Report following the purported re-calibration. In
    reality, no ADAS Service had been performed or authorized.
    Moreover, AS never signed the corresponding Opti-Aim Report or
    authorized anyone to do so on her behalf.

(ix)   On June 28, 2018, an Insured named EA authorized A&E Auto to
    replace his vehicle's windshield and to submit a claim to GEICO for
    the replacement service.   The windshield replacement was
    performed on June 28, 2018. As of June 28, 2018, EA's vehicle was
    not equipped with LDWS, EA did not request or authorize any
    safety feature re-calibration services, and did not sign any report or
    receipt related to any purported calibration of any of his vehicle's
    safety features. Nonetheless, on August 14, 2018, the Defendants
    submitted a fraudulent claim to GEICO seeking reimbursement of
    $250.00 for an ADAS Service purportedly provided to EA's vehicle
    on June 28, 2018. The claim falsely represented that: (a) that A&E

16

9078113

THORPE SHWER, P.C.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Auto had re-calibrated a non-existent LDWS system; and (b) that EA had signed an Opti-Aim Report following the purported re-calibration. In reality, no ADAS Service had been performed or authorized. Moreover, EA never signed the corresponding Opti-Aim Report or authorized anyone to do so on his behalf.

(x)    On December 19, 2018, an Insured named TH authorized A&E Auto to replace her vehicle's windshield and to submit a claim to GEICO for the replacement service.   The windshield replacement was performed on December 19, 2018. As of December 19, 2018, TH's vehicle was not equipped with LDWS, TH did not request or authorize any safety feature re-calibration services, and did not sign any report or receipt related to any purported calibration of any of her vehicle's safety features. Nonetheless, on December 28, 2018, the Defendants submitted a fraudulent claim to GEICO seeking reimbursement of $250.00 for an ADAS Service purportedly provided to TH's vehicle on December 19, 2018. The claim falsely represented that: (a) that A&E Auto had re-calibrated a non-existent LDWS system; and (b) that TH had signed an Opti-Aim Report following the purported re-calibration. In reality, no ADAS Service had been performed or authorized. Moreover, TH never signed the corresponding Opti-Aim Report or authorized anyone to do so on her behalf.

(xi)   On September 28, 2018, an Insured named JJ authorized A&E Auto to replace her vehicle's windshield and to submit a claim to GEICO for the replacement service.   The windshield replacement was performed on September 28, 2018. As of September 28, 2018, JJ's vehicle was not equipped with LDWS, JJ did not request or authorize any safety feature re-calibration services, and did not sign any report or receipt related to any purported calibration of any of her vehicle's safety features. Nonetheless, on October 10, 2018, the Defendants submitted a fraudulent claim to GEICO seeking reimbursement of $250.00 for an ADAS Service purportedly provided to JJ's vehicle on September 28, 2018. The claim falsely represented that: (a) that A&E Auto had re-calibrated a non-existent LDWS system; and (b) that JJ had signed an Opti-Aim Report following the purported re-calibration. In reality, no ADAS Service had been performed or authorized. Moreover, JJ never signed the corresponding Opti-Aim Report or authorized anyone to do so on her behalf.

(xii)  On May 23, 2018, an Insured named PD authorized A&E Auto to replace his vehicle's windshield and to submit a claim to GEICO for the replacement service.   The windshield replacement was

17

9078113

THORPE SHWER, P.C.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

performed on May 23, 2018. As of May 23, 2018, PD's vehicle was not equipped with LDWS, PD did not request or authorize any safety feature re-calibration services, and did not sign any report or receipt related to any purported calibration of any of his vehicle's safety features. Nonetheless, on June 7, 2018, the Defendants submitted a fraudulent claim to GEICO seeking reimbursement of $250.00 for an ADAS Service purportedly provided to PD's vehicle on May 23, 2018. The claim falsely represented that: (a) that A&E Auto had re-calibrated a non-existent LDWS system; and (b) that PD had signed an Opti-Aim Report following the purported re-calibration. In reality, no ADAS Service had been performed or authorized. Moreover, PD never signed the corresponding Opti-Aim Report or authorized anyone to do so on his behalf.

(xiii) On July 5, 2018, an Insured named SM authorized A&E Auto to replace her vehicle's windshield and to submit a claim to GEICO for the replacement service. The windshield replacement was performed on July 5, 2018. As of July 5, 2018, SM's vehicle was not equipped with LDWS, SM did not request or authorize any safety feature re-calibration services, and did not sign any report or receipt related to any purported calibration of any of her vehicle's safety features. Nonetheless, on July 17, 2018, the Defendants submitted a fraudulent claim to GEICO seeking reimbursement of $250.00 for an ADAS Service purportedly provided to SM's vehicle on July 5, 2018. The claim falsely represented that: (a) that A&E Auto had re-calibrated a non-existent LDWS system; and (b) that SM had signed an Opti-Aim Report following the purported re-calibration. In reality, no ADAS Service had been performed or authorized. Moreover, SM never signed the corresponding Opti-Aim Report or authorized anyone to do so on her behalf.

(xiv) On August 10, 2018 an Insured named TK authorized A&E Auto to replace her vehicle's windshield and to submit a claim to GEICO for the replacement service. The windshield replacement was performed on August 10, 2018. As of August 10, 2018, TK's vehicle was not equipped with LDWS, TK did not request or authorize any safety feature re-calibration services, and did not sign any report or receipt related to any purported calibration of any of her vehicle's safety features. Nonetheless, on September 11, 2018, the Defendants submitted a fraudulent claim to GEICO seeking reimbursement of $250.00 for an ADAS Service purportedly provided to TK's vehicle on August 10, 2018. The claim falsely represented that: (a) that A&E Auto had re-calibrated a non-existent LDWS system; and (b) that TK had signed an Opti-Aim Report following the purported re-

18

9078113

calibration. In reality, no ADAS Service had been performed or authorized. Moreover, TK never signed the corresponding Opti-Aim Report or authorized anyone to do so on her behalf.

(xv)   On April 26, 2018, an Insured named NS authorized A&E Auto to replace her vehicle's windshield and to submit a claim to GEICO for the replacement service.   The windshield replacement was performed on April 26, 2018. As of April 26, 2018, NS's vehicle was not equipped with LDWS, NS did not request or authorize any safety feature re-calibration services, and did not sign any report or receipt related to any purported calibration of any of her vehicle's safety features. Nonetheless, on May 5, 2018, the Defendants submitted a fraudulent claim to GEICO seeking reimbursement of $250.00 for an ADAS Service purportedly provided to NS's vehicle on April 26, 2018. The claim falsely represented that: (a) that A&E Auto had re-calibrated a non-existent LDWS system; and (b) that NS had signed an Opti-Aim Report following the purported re-calibration. In reality, no ADAS Service had been performed or authorized. Moreover, NS never signed the corresponding Opti-Aim Report or authorized anyone to do so on her behalf.

49.   These are only representative examples. In virtually all of the claims for ADAS Services identified in Exhibit "1", the Defendants falsely represented that: (i) the vehicles were equipped with a LDWS safety feature, when in fact they were not; (ii) the Insureds had authorized and consented to the performance of ADAS Services and the resulting billing to GEICO for such services, when in fact they had not; (iii) the Insureds had signed the Opti-Aim report, when in fact they had not; and (iv) ADAS Services had been provided, when in fact they had not.

**B.    Billing for Glass Services and Glass Parts that were Never Legitimately Performed or Provided in the First Instance**

50.   In addition to the ADAS Services, the Defendants claimed to have provided and actually billed GEICO for Glass Services and Glass Parts, consisting of the replacement of windshields and parts that are attendant thereto.

19

9078113

THORPE SHWER, P.C.

51.     In order to receive reimbursement for the Glass Services and Glass Parts, the Defendants were required to provide GEICO with proof of their acquisition of those parts to substantiate their requested reimbursement.   However, the Defendants never legitimately purchased the Glass Parts for which they sought reimbursement from GEICO.

52.     The Defendants knew that, without documentation substantiating their acquisition of the Glass Parts, they would be unable to submit large amounts of Glass Parts billing to GEICO.   Therefore, the Defendants adopted to a fraudulent practice to create the false appearance that they had legitimately purchased the Glass Parts from reputable Arizona automobile dealerships and that, therefore, they were entitled to reimbursement for the Glass Parts and Glass Services.

53.     To accomplish that goal, the Defendants fabricated invoices – which they created to resemble legitimate purchase invoices from actual Arizona automobile dealerships – and which were designed to create the appearance that the Defendants had actually purchased Glass Parts from the dealerships (the "Phony Dealership Invoices").

54.     The Defendants created the Phony Dealership Invoices to look as if they had actually been generated by the dealerships. Each invoice included the dealership name, a logo, and contact information for the dealership.

55.     Then, the Defendants would submit claims for reimbursement to GEICO seeking installation of Glass Parts and, in support of these claims, submitted the Phony Dealership Invoices to GEICO via interstate wire transmission, falsely representing that

9078113

they had legitimately acquired the Glass Parts and were therefore entitled to reimbursement.

56. However, in reality, virtually all of these invoices were fabricated by the Defendants to create the appearance that the Defendants: (i) purchased the windshields and attendant parts from a legitimate source; (ii) actually provided the billed-for Glass Services and Glass Parts; and, therefore (iii) were entitled to the reimbursement sought in the invoices for the Glass Services and Glass Parts submitted to GEICO.

57. As part of its investigation, GEICO confirmed the fraudulent nature of the Phony Dealership Invoices submitted by A&E Auto to support the claims identified within Exhibit "1". In this context, GEICO secured affidavits from the Arizona automobile dealerships alleged to have generated the invoices, which consistently indicate that the Defendants' Phony Dealership Invoices were fabricated and did not represent legitimate transactions between the Defendants and the individual dealerships.

58. For example:

(i) On February 15, 2019, Mike Pinney executed an affidavit in which Mike Pinney indicated: (i) Mike Pinney reviewed 12 invoices that A&E Auto provided to GEICO that were purportedly from Audi Chandler; (ii) that the 12 invoices from Audi Chandler were not created by or submitted by Audi Chandler or Audi Chandler's employees; and (iii) that the goods described in the 12 invoices from Audi Chandler were never purchased by A&E Auto. Nonetheless, A&E Auto submitted the 12 invoices from Audi Chandler in conjunction with its claims to GEICO to support A&E Auto's invoices for Glass Parts and Glass Services that it purportedly provided to the Insureds. The claims falsely represented that A&E purchased Glass Parts from Audi Chandler that was provided to the Insureds. In reality, the invoices from Audi Chandler submitted to GEICO were fabricated since the Defendants never purchased any Glass Parts from Audi Chandler and Audi Chandler never created the 12 invoices submitted by A&E Auto to GEICO.

21

THORPE SHWER, P.C.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

(ii)    On February 13, 2019, John Mollerup executed an affidavit in which John Mollerup indicated: (i) John Mollerup reviewed 170 invoices that A&E Auto provided to GEICO that were purportedly from Power Nissan a/k/a Auto Nation Nissan; (ii) that the 170 invoices from Power Nissan were not created by or submitted by Auto Nation Nissan or Power Nissan's employees; and (iii) that the goods described in the 170 invoices from Power Nissan were never purchased by A&E Auto. Nonetheless, A&E Auto submitted the 170 invoices from Power Nissan in conjunction with its claims to GEICO to support A&E Auto's invoices for Glass Parts and Glass Services that it purportedly provided to the Insureds. The claims falsely represented that A&E purchased Glass Parts from Power Nissan that was provided to the Insureds. In reality, the invoices from Power Nissan submitted to GEICO were fabricated since the Defendants never purchased any Glass Parts from Power Nissan and Power Nissan never created the 170 invoices submitted by A&E Auto to GEICO.

(iii)   On February 19, 2019, David Priest executed an affidavit in which David Priest indicated: (i) David Priest reviewed 181 invoices that A&E Auto provided to GEICO that were purportedly from Auto Nation Parts Center; (ii) that the 181 invoices from Auto Nation Parts Center were not created by or submitted by Auto Nation Parts Center or Auto Nation Parts Center's employees; and (iii) that the goods described in the 181 invoices from Auto Nation Parts Center were never purchased by A&E Auto. Nonetheless, A&E Auto submitted the 181 invoices from Auto Nation Parts Center in conjunction with its claims to GEICO to support A&E Auto's invoices for Glass Parts and Glass Services that it purportedly provided to the Insureds. The claims falsely represented that A&E purchased Glass Parts from Auto Nation Parts Center that was provided to the Insureds. In reality, the invoices from Auto Nation Parts Center submitted to GEICO were fabricated since the Defendants never purchased any Glass Parts from Auto Nation Parts Center and Auto Nation Parts Center never created the 181 invoices submitted by A&E Auto to GEICO.

(iv)    On February 13, 2019, Butch Lemen executed an affidavit in which Butch Lemen indicated: (i) Butch Lemen reviewed 124 invoices that A&E Auto provided to GEICO that were purportedly from Berge Ford; (ii) that the 124 invoices from Berge Ford were not created by or submitted by Berge Ford or Berge Ford's employees; and (iii) that the goods described in the 124 invoices from Berge Ford were never purchased by A&E Auto. Nonetheless, A&E Auto submitted the 124

22

9078113

invoices from Berge Ford in conjunction with its claims to GEICO to support A&E Auto's invoices for Glass Parts and Glass Services that it purportedly provided to the Insureds. The claims falsely represented that A&E purchased Glass Parts from Berge Ford that was provided to the Insureds. In reality, the invoices from Berge Ford submitted to GEICO were fabricated since the Defendants never purchased any Glass Parts from Berge Ford and Berge Ford never created the 124 invoices submitted by A&E Auto to GEICO.

(v)    On February 13, 2019, Todd McMahon executed an affidavit in which Todd McMahon indicated: (i) Todd McMahon reviewed 69 invoices that A&E Auto provided to GEICO that were purportedly from Berge Volkswagen Mazda; (ii) that the 69 invoices from Berge Volkswagen Mazda were not created by or submitted by Berge Volkswagen Mazda or Berge Volkswagen Mazda's employees; and (iii) that the goods described in the 69 invoices from Berge Volkswagen Mazda were never purchased by A&E Auto. Nonetheless, A&E Auto submitted the 69 invoices from Berge Volkswagen Mazda in conjunction with its claims to GEICO to support A&E Auto's invoices for Glass Parts and Glass Services that it purportedly provided to the Insureds. The claims falsely represented that A&E purchased Glass Parts from Berge Volkswagen Mazda that was provided to the Insureds. In reality, the invoices from Berge Volkswagen Mazda submitted to GEICO were fabricated since the Defendants never purchased any Glass Parts from Berge Volkswagen Mazda and Berge Volkswagen Mazda never created the 69 invoices submitted by A&E Auto to GEICO.

(vi)   On February 14, 2019, Alex Villar executed an affidavit in which Alex Villar indicated: (i) Alex Villar reviewed 10 invoices that A&E Auto provided to GEICO that were purportedly from Big Two Mitsubishi; (ii) that the 10 invoices from Big Two Mitsubishi were not created by or submitted by Big Two Mitsubishi or Big Two Mitsubishi's employees; and (iii) that the goods described in the 10 invoices from Big Two Mitsubishi were never purchased by A&E Auto. Nonetheless, A&E Auto submitted the 10 invoices from Big Two Mitsubishi in conjunction with its claims to GEICO to support A&E Auto's invoices for Glass Parts and Glass Services that it purportedly provided to the Insureds. The claims falsely represented that A&E purchased Glass Parts from Big Two Mitsubishi that was provided to the Insureds. In reality, the invoices from Big Two Mitsubishi submitted to GEICO were fabricated since the Defendants never purchased any Glass Parts from Big Two

Mitsubishi and Big Two Mitsubishi never created the 10 invoices submitted by A&E Auto to GEICO.

(vii)   On February 19, 2019, Eric Francis executed an affidavit in which Eric Francis indicated: (i) Eric Francis reviewed 32 invoices that A&E Auto provided to GEICO that were purportedly from Chapman BMW; (ii) that the 32 invoices from Chapman BMW were not created by or submitted by Chapman BMW or Chapman BMW's employees; and (iii) that the goods described in the 32 invoices from Chapman BMW were never purchased by A&E Auto. Nonetheless, A&E Auto submitted the 32 invoices from Chapman BMW in conjunction with its claims to GEICO to support A&E Auto's invoices for Glass Parts and Glass Services that it purportedly provided to the Insureds. The claims falsely represented that A&E purchased Glass Parts from Chapman BMW that was provided to the Insureds. In reality, the invoices from Chapman BMW submitted to GEICO were fabricated since the Defendants never purchased any Glass Parts from Chapman BMW and Chapman BMW never created the 32 invoices submitted by A&E Auto to GEICO.

(viii)   On February 15, 2019, Josh Kares executed an affidavit in which Josh Kares indicated: (i) Josh Kares reviewed 7 invoices that A&E Auto provided to GEICO that were purportedly from Subaru Superstore of Chandler; (ii) that the 7 invoices from Subaru Superstore of Chandler were not created by or submitted by Subaru Superstore of Chandler or Subaru Superstore of Chandler's employees; and (iii) that the goods described in the 7 invoices from Subaru Superstore of Chandler were never purchased by A&E Auto. Nonetheless, A&E Auto submitted the 7 invoices from Subaru Superstore of Chandler in conjunction with its claims to GEICO to support A&E Auto's invoices for Glass Parts and Glass Services that it purportedly provided to the Insureds. The claims falsely represented that A&E purchased Glass Parts from Subaru Superstore of Chandler that was provided to the Insureds. In reality, the invoices from Subaru Superstore of Chandler submitted to GEICO were fabricated since the Defendants never purchased any Glass Parts from Subaru Superstore of Chandler and Subaru Superstore of Chandler never created the 7 invoices submitted by A&E Auto to GEICO.

(ix)   On February 19, 2019, John Hill executed an affidavit in which John Hill indicated: (i) John Hill reviewed 8 invoices that A&E Auto provided to GEICO that were purportedly from Schumacher Mercedes Benz; (ii) that the 8 invoices from Schumacher Mercedes Benz were not created by or submitted by Schumacher Mercedes

THORPE SHWER, P.C.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Benz or Schumacher Mercedes Benz's employees; and (iii) that the goods described in the 8 invoices from Schumacher Mercedes Benz were never purchased by A&E Auto. Nonetheless, A&E Auto submitted the 8 invoices from Schumacher Mercedes Benz in conjunction with its claims to GEICO to support A&E Auto's invoices for Glass Parts and Glass Services that it purportedly provided to the Insureds. The claims falsely represented that A&E purchased Glass Parts from Schumacher Mercedes Benz that was provided to the Insureds. In reality, the invoices from Schumacher Mercedes Benz submitted to GEICO were fabricated since the Defendants never purchased any Glass Parts from Schumacher Mercedes Benz and Schumacher Mercedes Benz never created the 8 invoices submitted by A&E Auto to GEICO.

(x)  On February 15, 2019, Ben Smihula executed an affidavit in which Ben Smihula indicated: (i) Ben Smihula reviewed 19 invoices that A&E Auto provided to GEICO that were purportedly from Superstition Springs Lexus; (ii) that the 19 invoices from Superstition Springs Lexus were not created by or submitted by Superstition Springs Lexus or Superstition Springs Lexus's employees; and (iii) that the goods described in the 19 invoices from Superstition Springs Lexus were never purchased by A&E Auto. Nonetheless, A&E Auto submitted the 19 invoices from Superstition Springs Lexus in conjunction with its claims to GEICO to support A&E Auto's invoices for Glass Parts and Glass Services that it purportedly provided to the Insureds. The claims falsely represented that A&E purchased Glass Parts from Superstition Springs Lexus that was provided to the Insureds. In reality, the invoices from Superstition Springs Lexus submitted to GEICO were fabricated since the Defendants never purchased any Glass Parts from Superstition Springs Lexus and Superstition Springs Lexus never created the 19 invoices submitted by A&E Auto to GEICO.

(xi)  On February 13, 2019, Ken Lanious executed an affidavit in which Ken Lanious indicated: (i) Ken Lanious reviewed 95 invoices that A&E Auto provided to GEICO that were purportedly from Tempe Dodge Chrysler Jeep; (ii) that the 95 invoices from Tempe Dodge Chrysler Jeep were not created by or submitted by Tempe Dodge Chrysler Jeep or Tempe Dodge Chrysler Jeep's employees; and (iii) that the goods described in the 95 invoices from Tempe Dodge Chrysler Jeep were never purchased by A&E Auto. Nonetheless, A&E Auto submitted the 95 invoices from Tempe Dodge Chrysler Jeep in conjunction with its claims to GEICO to support A&E Auto's invoices for Glass Parts and Glass Services that it

25

THORPE SHWER, P.C.

1
2
3
4
5

purportedly provided to the Insureds. The claims falsely represented that A&E purchased Glass Parts from Tempe Dodge Chrysler Jeep that was provided to the Insureds. In reality, the invoices from Tempe Dodge Chrysler Jeep submitted to GEICO were fabricated since the Defendants never purchased any Glass Parts from Tempe Dodge Chrysler Jeep and Tempe Dodge Chrysler Jeep never created the 95 invoices submitted by A&E Auto to GEICO.

6
7
8
9
10
11
12
13
14
15
16

(xii)   On February 25, 2019, Glen Bolz executed an affidavit in which Glen Bolz indicated: (i) Glen Bolz reviewed 94 invoices that A&E Auto provided to GEICO that were purportedly from Earnhardt Dodge; (ii) that the 94 invoices from Earnhardt Dodge were not created by or submitted by Earnhardt Dodge or Earnhardt Dodge's employees; and (iii) that the goods described in the 94 invoices from Earnhardt Dodge were never purchased by A&E Auto. Nonetheless, A&E Auto submitted the 94 invoices from Earnhardt Dodge in conjunction with its claims to GEICO to support A&E Auto's invoices for Glass Parts and Glass Services that it purportedly provided to the Insureds. The claims falsely represented that A&E purchased Glass Parts from Earnhardt Dodge that was provided to the Insureds. In reality, the invoices from Earnhardt Dodge submitted to GEICO were fabricated since the Defendants never purchased any Glass Parts from Earnhardt Dodge and Earnhardt Dodge never created the 94 invoices submitted by A&E Auto to GEICO.

17
18
19
20
21
22
23
24
25
26

(xiii)  On February 25, 2019, Glen Bolz executed an affidavit in which Glen Bolz indicated: (i) Glen Bolz reviewed 70 invoices that A&E Auto provided to GEICO that were purportedly from Earnhardt Kia; (ii) that the 70 invoices from Earnhardt Kia were not created by or submitted by Earnhardt Kia or Earnhardt Kia's employees; and (iii) that the goods described in the 70 invoices from Earnhardt Kia were never purchased by A&E Auto. Nonetheless, A&E Auto submitted the 70 invoices from Earnhardt Kia in conjunction with its claims to GEICO to support A&E Auto's invoices for Glass Parts and Glass Services that it purportedly provided to the Insureds. The claims falsely represented that A&E purchased Glass Parts from Earnhardt Kia that was provided to the Insureds. In reality, the invoices from Earnhardt Kia submitted to GEICO were fabricated since the Defendants never purchased any Glass Parts from Earnhardt Kia and Earnhardt Kia never created the 70 invoices submitted by A&E Auto to GEICO.

27
28

(xiv)   On February 25, 2019, Glen Bolz executed an affidavit in which Glen Bolz indicated: (i) Glen Bolz reviewed 187 invoices that A&E

9078113

Auto provided to GEICO that were purportedly from Earnhardt Toyota; (ii) that the 187 invoices from Earnhardt Toyota were not created by or submitted by Earnhardt Toyota or Earnhardt Toyota's employees; and (iii) that the goods described in the 187 invoices from Earnhardt Toyota were never purchased by A&E Auto. Nonetheless, A&E Auto submitted the 187 invoices from Earnhardt Toyota in conjunction with its claims to GEICO to support A&E Auto's invoices for Glass Parts and Glass Services that it purportedly provided to the Insureds. The claims falsely represented that A&E purchased Glass Parts from Earnhardt Toyota that was provided to the Insureds. In reality, the invoices from Earnhardt Toyota submitted to GEICO were fabricated since the Defendants never purchased any Glass Parts from Earnhardt Toyota and Earnhardt Toyota never created the 187 invoices submitted by A&E Auto to GEICO.

(xv)    On February 25, 2019, Glen Bolz executed an affidavit in which Glen Bolz indicated: (i) Glen Bolz reviewed 71 invoices that A&E Auto provided to GEICO that were purportedly from San Tan Hyundai; (ii) that the 71 invoices from San Tan Hyundai were not created by or submitted by San Tan Hyundai or San Tan Hyundai's employees; and (iii) that the goods described in the 71 invoices from San Tan Hyundai were never purchased by A&E Auto. Nonetheless, A&E Auto submitted the 71 invoices from San Tan Hyundai in conjunction with its claims to GEICO to support A&E Auto's invoices for Glass Parts and Glass Services that it purportedly provided to the Insureds. The claims falsely represented that A&E purchased Glass Parts from San Tan Hyundai that was provided to the Insureds. In reality, the invoices from San Tan Hyundai submitted to GEICO were fabricated since the Defendants never purchased any Glass Parts from San Tan Hyundai and San Tan Hyundai never created the 71 invoices submitted by A&E Auto to GEICO.

The affidavits and fraudulent invoices that are referenced in ¶¶ 68(i) through (xv) are attached to this Complaint as Exhibits "5(a) through 5(o)".

59.    Once the Defendants generated the Phony Dealership Invoices, they submitted those invoices in support of their claims for the Glass Services and Glass Parts, falsely representing that they were entitled to reimbursement.  For example:

THORPE SHWER, P.C.

27

THORPE SHWER, P.C.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

(i)      On May 8, 2018, an Insured named BL authorized A&E Auto to replace his vehicle's windshield and to submit a claim to GEICO for the replacement service. On May 8, 2018 A&E only replaced BL's windshield. Besides the windshield, BL did not install or provide any Glass Parts to BL. Nonetheless, on May 18, 2018, the Defendants submitted a fraudulent claim to GEICO seeking reimbursement for a sensor in the amount of $247.69. In support of the fraudulent claim, the Defendants provided GEICO with a Phony Dealership Invoice from Chapman BMW. The claim falsely represented that: (a) A&E purchased a sensor from Chapman BMW; and (b) that A&E Auto had provided BL with a sensor. In reality, A&E Auto never purchased the Glass Parts from Chapman BMW and, thus, never provided it to BL.

(ii)     On November 20, 2018, an Insured named ME authorized A&E Auto to replace her vehicle's windshield and to submit a claim to GEICO for the replacement service. On November 20, 2018 A&E only replaced ME's windshield. Besides the windshield, ME did not install or provide any Glass Parts to ME. Nonetheless, on November 29, 2018, the Defendants submitted a fraudulent claim to GEICO seeking reimbursement for a molding in the amount of $68.92. In support of the fraudulent claim, the Defendants provided GEICO with a Phony Dealership Invoice from Earnhardt Kia. The claim falsely represented that: (a) A&E purchased a sensor from Earnhardt Kia; and (b) that A&E Auto had provided ME with a molding. In reality, A&E Auto never purchased the Glass Parts from Earnhardt Kia and, thus, never provided it to ME.

(iii)    On November 29, 2018, an Insured named JR authorized A&E Auto to replace his vehicle's windshield and to submit a claim to GEICO for the replacement service. On November 29, 2018 A&E only replaced JR's windshield. Besides the windshield, JR did not install or provide any Glass Parts to JR. Nonetheless, on December 6, 2018, the Defendants submitted a fraudulent claim to GEICO seeking reimbursement for: (i) a sensor in the amount of $255.14; and (ii) molding in the amount of $37.50. In support of the fraudulent claim, the Defendants provided GEICO with a Phony Dealership Invoice from Chapman BMW. The claim falsely represented that: (a) A&E purchased a sensor and molding from Chapman BMW; and (b) that A&E Auto had provided JR with a sensor and molding. In reality, A&E Auto never purchased the Glass Parts from Chapman BMW and, thus, never provided them to JR.

(iv)     On November 30 2018, an Insured named JA authorized A&E Auto to replace her vehicle's windshield and to submit a claim to GEICO

28

9078113

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

THORPE SHWER, P.C.

for the replacement service. On November 30, 2018 A&E only replaced JA's windshield. Besides the windshield, JA did not install or provide any Glass Parts to JA. Nonetheless, on December 8, 2018, the Defendants submitted a fraudulent claim to GEICO seeking reimbursement for a sensor in the amount of $284.90. In support of the fraudulent claim, the Defendants provided GEICO with a Phony Dealership Invoice from Berge Volkswagen Mazda. The claim falsely represented that: (a) A&E purchased a sensor from Berge Volkswagen Mazda; and (b) that A&E Auto had provided JA with a sensor. In reality, A&E Auto never purchased the Glass Parts from Berge Volkswagen Mazda and, thus, never provided it to JA.

(v)     On December 21, 2018, an Insured named SC authorized A&E Auto to replace her vehicle's windshield and to submit a claim to GEICO for the replacement service. Nonetheless, on January 10, 2019, the Defendants submitted a fraudulent claim to GEICO seeking reimbursement for a windshield in the amount of $632.98. In support of the fraudulent claim, the Defendants provided GEICO with a Phony Dealership Invoice from Earnhardt Toyota. The claim falsely represented that: (a) A&E purchased a windshield from Earnhardt Toyota; and (b) that A&E Auto had provided SC with a windshield from Earnhardt Toyota. In reality, A&E Auto never purchased the Glass Parts from Earnhardt Toyota and, thus, never provided it to SC.

(vi)    On August 24, 2018, an Insured named DR authorized A&E Auto to replace her vehicle's windshield and to submit a claim to GEICO for the replacement service. On August 24, 2018 A&E only replaced DR's windshield. Besides the windshield, DR did not install or provide any Glass Parts to DR. Nonetheless, on October 5, 2018, the Defendants submitted a fraudulent claim to GEICO seeking reimbursement for: (i) a trim in the amount of $83.75; (ii) a trim in the amount of $74.70; and (iii) four clips in the amount of $40.00. In support of the fraudulent claim, the Defendants provided GEICO with a Phony Dealership Invoice from Tempe Dodge Chrysler Jeep. The claim falsely represented that: (a) A&E purchased two trims and four clips from Tempe Dodge Chrysler Jeep; and (b) that A&E Auto had provided DR with two trims and four clips. In reality, A&E Auto never purchased the Glass Parts from Tempe Dodge Chrysler Jeep and, thus, never provided them to DR.

(vii)   On December 12, 2018, an Insured named RD authorized A&E Auto to replace his vehicle's windshield and to submit a claim to GEICO for the replacement service. Nonetheless, on January 10, 2019, the Defendants submitted a fraudulent claim to GEICO seeking

29

9078113

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

THORPE SHWER, P.C.

reimbursement for a windshield in the amount of $825.00. In support of the fraudulent claim, the Defendants provided GEICO with a Phony Dealership Invoice from Tempe Dodge Chrysler Jeep. The claim falsely represented that: (a) A&E purchased a windshield from Tempe Dodge Chrysler Jeep; and (b) that A&E Auto had provided RD with a windshield from Tempe Dodge Chrysler Jeep. In reality, A&E Auto never purchased the Glass Parts from Tempe Dodge Chrysler Jeep and, thus, never provided it to RD.

(viii)   On August 23, 2018, an Insured named AMW authorized A&E Auto to replace her vehicle's windshield and to submit a claim to GEICO for the replacement service. On August 23, 2018 A&E only replaced AMW's windshield. Besides the windshield, AMW did not install or provide any Glass Parts to AMW. Nonetheless, on September 27, 2018, the Defendants submitted a fraudulent claim to GEICO seeking reimbursement for a sensor in the amount of $65.60. In support of the fraudulent claim, the Defendants provided GEICO with a Phony Dealership Invoice from Auto Nation Parts Center. The claim falsely represented that: (a) A&E purchased a sensor from Auto Nation Parts Center; and (b) that A&E Auto had provided AMW with a sensor. In reality, A&E Auto never purchased the Glass Parts from Auto Nation Parts Center and, thus, never provided it to AMW.

(ix)   On December 6, 2018, an Insured named AS authorized A&E Auto to replace his vehicle's windshield and to submit a claim to GEICO for the replacement service. On December 6, 2018 A&E only replaced AS's windshield. Besides the windshield, AS did not install or provide any Glass Parts to AS. Nonetheless, on December 15, 2018, the Defendants submitted a fraudulent claim to GEICO seeking reimbursement for: (i) a molding in the amount of $108.14; (ii) a second molding in the amount of $108.14; and (iii) a third a molding in the amount of $49.77. In support of the fraudulent claim, the Defendants provided GEICO with a Phony Dealership Invoice from San Tan Hyundai. The claim falsely represented that: (a) A&E purchased two trims and four clips from San Tan Hyundai; and (b) that A&E Auto had provided AS with three moldings. In reality, A&E Auto never purchased the Glass Parts from San Tan Hyundai and, thus, never provided them to AS.

(x)   On January 30, 2019, an Insured named KL authorized A&E Auto to replace her vehicle's windshield and to submit a claim to GEICO for the replacement service. Nonetheless, on January 10, 2019, the Defendants submitted a fraudulent claim to GEICO seeking reimbursement for a windshield in the amount of $1,211.95. In

30

THORPE SHWER, P.C.

support of the fraudulent claim, the Defendants provided GEICO with a Phony Dealership Invoice from Big Two Mitsubishi. The claim falsely represented that: (a) A&E purchased a windshield from Big Two Mitsubishi; and (b) that A&E Auto had provided KL with a windshield from Big Two Mitsubishi. In reality, A&E Auto never purchased the Glass Parts from Big Two Mitsubishi and, thus, never provided it to KL.

60.    These are only representative examples. In the claims for Glass Services and Glass Parts identified in Exhibit "1", the Defendants routinely submitted the Phony Dealership Invoices in support of their claims in order to create the appearance that they had legitimately acquired the Glass Parts, when in fact they had not.

61.    Moreover, the billed for Glass Parts were largely never provided.   For example, in many cases, the Defendants would be authorized to provide – and purported to provide – windshield replacement services to Insureds without authorization to perform or provide any additional services.   Then, following these limited services, the Defendants would submit invoices to GEICO which falsely represented that they had installed a series of Glass Parts, supposedly attendant to the windshield replacements, which were never actually provided or installed.

62.    For example:

(i)    On October 17, 2018, an Insured named JR authorized A&E Auto to replace her vehicle's windshield and to submit a claim to GEICO for the replacement service. On October 17, 2018, A&E only replaced JR's windshield. Besides the windshield, JR did not authorize A&E Auto to install any Glass Parts, nor were any Glass Parts provided to JR. Nonetheless, on November 10, 2018, the Defendants submitted a fraudulent claim to GEICO seeking reimbursement for: (i) a windshield dam in the amount of $16.35; (ii) molding in the amount of $19.65; and (iii) a sensor in the amount of $399.65. The claim falsely represented that: (a) that A&E Auto had provided JR with a windshield dam, sensor, and molding; and (b) that JR had permitted A&E Auto to install a windshield dam, sensor, and molding in JR's

31

9078113

vehicle and submit a claim to GEICO for the installation of those parts. In reality, the Glass Parts were never provided to JR or authorized to install on her vehicle.

(ii)     On April 9, 2018, an Insured named JL authorized A&E Auto to replace her vehicle's windshield and to submit a claim to GEICO for the replacement service. On April 9, 2018 A&E only replaced JL's windshield. Besides the windshield, JL did not authorize A&E Auto to install any Glass Parts, nor were any Glass Parts provided to JL. Nonetheless, on April 14, 2018, the Defendants submitted a fraudulent claim to GEICO seeking reimbursement for: (i) a sensor module in the amount of $61.90; (ii) sensor track gel in the amount of $24.12; and (iii) molding in the amount of $48.36. The claim falsely represented that: (a) that A&E Auto had provided JL with a sensor module, sensor track gel, and molding; and (b) that JL had permitted A&E Auto to install a sensor module, sensor track gel, and molding in JL's vehicle and submit a claim to GEICO for the installation of those parts. In reality, the Glass Parts were never provided to JL or authorized to install on her vehicle.

(iii)    On November 16, 2018, an Insured named AS authorized A&E Auto to replace her vehicle's windshield and to submit a claim to GEICO for the replacement service. On November 16, 2018 A&E only replaced AS's windshield. Besides the windshield, AS did not authorize A&E Auto to install any Glass Parts, nor were any Glass Parts provided to AS. Nonetheless, on [date of service], the Defendants submitted a fraudulent claim to GEICO seeking reimbursement for: (i) sensor track gel in the amount of $24.12; and (ii) molding in the amount of $16.26. The claim falsely represented that: (a) that A&E Auto had provided AS with sensor track gel and molding; and (b) that AS had permitted A&E Auto to install sensor track gel and molding in AS's vehicle and submit a claim to GEICO for the installation of those parts. In reality, the Glass Parts were never provided to AS or authorized to install on her vehicle.

(iv)     On October 11, 2018, an Insured named RM authorized A&E Auto to replace her vehicle's windshield and to submit a claim to GEICO for the replacement service. On October 11, 2018 A&E only replaced RM's windshield. Besides the windshield, RM did not authorize A&E Auto to install any Glass Parts, nor were any Glass Parts provided to RM. Nonetheless, on [date of service], the Defendants submitted a fraudulent claim to GEICO seeking reimbursement for: (i) a trim in the amount of $80.60; (ii) a trim in the amount of $83.75; and (iii) clips in the amount of $40.00. The claim falsely represented that: (a) that A&E Auto had provided RM

32

THORPE SHWER, P.C.

with trims and clips; and (b) that RM had permitted A&E Auto to install trims and clips in RM's vehicle and submit a claim to GEICO for the installation of those parts. In reality, the Glass Parts were never provided to RM or authorized to install on her vehicle.

(v)    On April 26, 2018, an Insured named NS authorized A&E Auto to replace her vehicle's windshield and to submit a claim to GEICO for the replacement service. On April 26, 2018 A&E only replaced NS's windshield. Besides the windshield, NS did not authorize A&E Auto to install any Glass Parts, nor were any Glass Parts provided to NS. Nonetheless, on May 5, 2018, the Defendants submitted a fraudulent claim to GEICO seeking reimbursement for: (i) two moldings in the amount of $241.67 each; (ii) one molding in the amount of $41.66; (iii) a windshield spacer in the amount of $24.40; and (iv) a sensor in the amount of $293.33. The claim falsely represented that: (a) that A&E Auto had provided NS with moldings, a windshield spacer, and a sensor; and (b) that NS had permitted A&E Auto to install moldings, a windshield spacer, and a sensor in NS's vehicle and submit a claim to GEICO for the installation of those parts. In reality, the Glass Parts were never provided to NS or authorized to install on her vehicle.

(vi)   On May 23, 2018, an Insured named PD authorized A&E Auto to replace his vehicle's windshield and to submit a claim to GEICO for the replacement service. On May 23, 2018 A&E only replaced PD's windshield. Besides the windshield, PD did not authorize A&E Auto to install any Glass Parts, nor were any Glass Parts provided to PD. Nonetheless, on June 7, 2018, the Defendants submitted a fraudulent claim to GEICO seeking reimbursement for molding in the amount of $35.11. The claim falsely represented that: (a) that A&E Auto had provided PD with molding; and (b) that PD had permitted A&E Auto to install molding in PD's vehicle and submit a claim to GEICO for the installation of those parts. In reality, the Glass Parts were never provided to PD authorized to install on his vehicle.

(vii)  On September 28, 2018, an Insured named JJ authorized A&E Auto to replace her vehicle's windshield and to submit a claim to GEICO for the replacement service. On September 28, 2018 A&E only replaced JJ's windshield. Besides the windshield, JJ did not authorize A&E Auto to install any Glass Parts, nor were any Glass Parts provided to JJ. Nonetheless, on October 10, 2018, the Defendants submitted a fraudulent claim to GEICO seeking reimbursement for: (i) molding in the amount of $62.14; and (ii) a sensor in the amount of $120.16. The claim falsely represented that: (a) that A&E Auto had provided JJ with a molding and a sensor; and

33

THORPE SHWER, P.C.

(b) that JJ had permitted A&E Auto to install a molding and a sensor in JJ's vehicle and submit a claim to GEICO for the installation of those parts. In reality, the Glass Parts were never provided to JJ or authorized to install on her vehicle.

(viii)   On April 25, 2018, an Insured named MW authorized A&E Auto to replace his vehicle's windshield and to submit a claim to GEICO for the replacement service. On April 25, 2018 A&E only replaced MW's windshield. Besides the windshield, MW did not authorize A&E Auto to install any Glass Parts, nor were any Glass Parts provided to MW. Nonetheless, on May 4, 2018, the Defendants submitted a fraudulent claim to GEICO seeking reimbursement for: (i) molding in the amount of $62.14; and (ii) a sensor in the amount of $120.16. The claim falsely represented that: (a) that A&E Auto had provided MW with a sensor and molding; and (b) that MW had permitted A&E Auto to install a sensor and molding in MW's vehicle and submit a claim to GEICO for the installation of those parts. In reality, the Glass Parts were never provided to MW or authorized to install on his vehicle.

(ix)   On September 6, 2018, an Insured named JB authorized A&E Auto to replace his vehicle's windshield and to submit a claim to GEICO for the replacement service. On September 6, 2018 A&E only replaced JB's windshield. Besides the windshield, JB did not authorize A&E Auto to install any Glass Parts, nor were any Glass Parts provided to JB. Nonetheless, on September 25, 2018, the Defendants submitted a fraudulent claim to GEICO seeking reimbursement for: (i) molding in the amount of $20.69; (ii) molding in the amount of $34.30; (iii) a trim in the amount of $83.75; (iv) a trim in the amount of $75.70; and (v) clips in the amount of $40.00. The claim falsely represented that: (a) that A&E Auto had provided JB with moldings, trims, and clips; and (b) that JB had permitted A&E Auto to install moldings, trims, and clips in JB's vehicle and submit a claim to GEICO for the installation of those parts. In reality, the Glass Parts were never provided to JB or authorized to install on his vehicle.

(x)   On December 6, 2018, an Insured named AS authorized A&E Auto to replace his vehicle's windshield and to submit a claim to GEICO for the replacement service. On December 6, 2018 A&E only replaced AS's windshield. Besides the windshield, AS did not authorize A&E Auto to install any Glass Parts, nor were any Glass Parts provided to AS. Nonetheless, on December 15, 2018, the Defendants submitted a fraudulent claim to GEICO seeking reimbursement for: (i) two moldings in the amount of $108.14 each;

34

and (iii) a third molding in the amount of $49.77. The claim falsely represented that: (a) that A&E Auto had provided AS with moldings; and (b) that AS had permitted A&E Auto to install moldings in AS's vehicle and submit a claim to GEICO for the installation of those parts. In reality, the Glass Parts were never provided to AS or authorized to install on his vehicle.

63.     These are only representative examples. In the claims for Glass Parts identified in Exhibit "1", the Defendants routinely represented that they had provided and installed Glass Parts attendant to the windshield replacements, when in fact they had not.

III.    **The Fraudulent Claims the Defendants Submitted or Caused to be Submitted to GEICO**

64.     To support the fraudulent charges, the Defendants systematically submitted or caused to be submitted thousands of claims to GEICO through A&E Auto seeking payment for Glass Services and Glass Parts that were never provided by the Defendants.

65.     All of the claims for Glass Services and Glass Parts identified in Exhibit "1" were submitted by Defendants via electronic transmission from Arizona to GEICO's third-party administrator in Columbus, Ohio.

66.     The claims that the Defendants submitted or caused to be submitted to GEICO were false and misleading in the following material respects:

(i)     The claims submitted by the Defendants submitted through A&E Auto falsely represented that the ADAS Services, the Glass Services, and the Glass Parts were legitimately performed and/or provided, when in fact they were not.

(ii)    The claims submitted by the Defendants through A&E Auto falsely represented that A&E Auto had acquired the Glass Parts they purported to install for Insureds, when in fact they had not.

THORPE SHWER, P.C.

35

9078113

THORPE SHWER, P.C.

**IV.    The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance**

67.    The Defendants were legally and ethically obligated to act honestly and with integrity in connection with their performance of the purported Glass Services, Glass Parts, and their submission of charges to GEICO.

68.    To induce GEICO to promptly pay the fraudulent charges for the Glass Services and Glass Parts, the Defendants systemically concealed their fraud and have gone to great lengths to accomplish this concealment.

69.    Specifically, the Defendants created, or caused the creation of, the Phony Dealership Invoices which purported to support the submission of claims for Glass Parts in order to create the false impression that the Glass Services and Glass Parts had been performed and/or provided by the Defendants, and that the Defendants had incurred some legitimate costs in acquiring the Glass Parts.

70.    Additionally, the Defendants created and submitted ADAS Receipts to GEICO which purported to support the submission of claims for the ADAS Services in order to create the false impression that the ADAS Services had been authorized by the Insureds, that the Insureds had signed the ADAS Receipts, the Insureds' vehicles were equipped with an ADAS feature which required re-calibration, and that the ADAS Services were legitimately performed in the first instance.

71.    GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially-valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations

36

9078113

described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO has incurred damages of more than $1,900,000.00.

72.     Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraudulent conduct from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

### FIRST CAUSE OF ACTION
**Against A&E Auto**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

73.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 72 above.

74.     There is an actual case in controversy between GEICO and A&E Auto regarding more than $90,000.00 (enter number here) in fraudulent claims for the purported Glass Services and Glass Parts that has been submitted to GEICO.

75.     A&E Auto has no right to receive payment for any pending claims submitted to GEICO because the claims misrepresented that A&E Auto provided the underlying services, when in fact they did not.

76.     A&E Auto has no right to receive payment for any pending bills submitted to GEICO because the bills misrepresented the specific Glass Services and Glass Parts that A&E Auto purported to provide the Insureds.

77.     A&E Auto has no right to receive payment for any pending claims submitted to GEICO because the claims misrepresented that the billed-for services actually constituted legitimate windshield repairs and replacements, when in fact they did not.

THORPE SHWER, P.C.

9078113

78.     A&E Auto has no right to receive payment for any pending claims submitted to GEICO because the claims misrepresented that the billed-for services were actually provided, when in fact they were not.

79.     Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that A&E Auto has no right to receive payment for any pending claims submitted to GEICO.

## SECOND CAUSE OF ACTION
### Against E. Solheim and A. Solheim
### (Violation of RICO, 18 U.S.C. § 1962(c))

80.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 79 above.

81.     A&E Auto is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

82.     E. Solheim and A. Solheim have knowingly conducted and/or participated, directly or indirectly, in the conduct of A&E Auto's affairs through a pattern of racketeering activity consisting of repeated violations of the federal wire fraud statute, 18 U.S.C. § 1343, based upon the use of the wires in interstate commerce to submit or cause to be submitted thousands of fraudulent claims for Glass Services and Glass Parts on a continuous basis for more than one year seeking insurance payments under GEICO insurance policies that A&E Auto was never entitled to receive because: (i) the Glass Services never had any legitimate reparative value, and were never performed in the first instance; (ii) the Glass Parts never had any legitimate reparative value, a vast majority of the Glass Parts were never provided in the first instance; and (iii) never provided OEM

THORPE SHWER, P.C.

glass to the Insureds. A representative sample of the fraudulent bills and corresponding facsimiles submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

83.     A&E Auto's business is racketeering activity, inasmuch as the enterprise exists solely for the purpose of submitting fraudulent charges to Arizona automobile insurers.  The predicate acts of wire fraud are the regular way in which E. Solheim and A. Solheim operate A&E Auto, insofar as A&E Auto was never eligible to bill GEICO or other automobile insurers for the Glass Services and Glass Parts, and the acts of wire fraud therefore are essential in order for A&E Auto to function.  Furthermore, the intricate planning required to carry out and conceal the predicate acts of wire fraud implies a threat of continued criminal activity, as does the fact that attempts to collect on the fraudulent billing submitted through A&E Auto continue to the present day.

84.     A&E Auto is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by A&E Auto in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent billing of Glass Services and Glass Parts.

85.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,900,000.00 pursuant to the fraudulent claims submitted through A&E Auto.

THORPE SHWER, P.C.

39

9078113

86.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### THIRD CAUSE OF ACTION
**Against E. Solheim and A. Solheim**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

87.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 86 above.

88.     A&E Auto is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

89.     E. Solheim and A. Solheim employed by and/or associated with the A&E Auto enterprise.

90.     E. Solheim and A. Solheim knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the A&E Auto enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal wire fraud statute, 18 U.S.C. § 1343, based upon the use of the wires in interstate commerce to submit or cause to be submitted thousands of fraudulent claims for Glass Services and Glass Parts on a continuous basis for more than one year seeking insurance payments under GEICO insurance policies that A&E Auto was never entitled to receive because: (i) the Glass Services never had any legitimate reparative value, and were never performed in the first instance; (ii) the Glass Parts never had any legitimate reparative value, a vast majority of the Glass Parts were never provided in the first instance; and (iii) never provided OEM glass to the Insureds. A representative sample of the fraudulent bills and corresponding claim submissions submitted to GEICO

THORPE SHWER, P.C.

using wires in interstate commerce that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the charts annexed hereto as Exhibit "1". Each such wire transmission was made by Defendants in furtherance of the wire fraud scheme.

91.     E. Solheim and A. Solheim knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

92.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,900,000.00 pursuant to the fraudulent bills submitted through the A&E Auto enterprise.

93.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**FOURTH CAUSE OF ACTION**
**Against E. Solheim and A. Solheim**
**(Violation of Ariz. Rev. Stat. § 13-2314-04)**

94.     GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1 through 92 above.

95.     In furtherance of the fraudulent claims identified through the date of this Complaint are described, in part, in the charts annexed hereto as Exhibit "1", the Defendants submitted or caused to be submitted thousands of fraudulent invoices and supporting paperwork in order to obtain reimbursement for private motor vehicle insurance policies to GEICO.

41

THORPE SHWER, P.C.

96.     When the claims for reimbursement were submitted to GEICO, the Defendants knew that the submission of invoices and supporting paperwork contained false and misleading information concerning facts material to GEICO's determination to pay claims, including misrepresentations that: (i) A&E Auto performed Glass Services to the Insureds, when such Glass Services were never performed in the first instance; (ii) A&E Auto performed ADAS Services to the Insureds by submitting ADAS Receipts containing the Insureds' signatures, when the Insureds never signed such ADAS Receipts and the ADAS Services were never performed in the first instance; (iii) A&E Auto provided Glass Parts to the Insureds, when at least – if not all – of the Glass Parts were never provided in the first instance; (iv) A&E Auto provided OEM glass to the Insureds when such only Non-OEM glass was provided to the Insureds; and (v) A&E Auto purchased specific Glass Parts and/or OEM glass from automotive dealerships that was purportedly provided to the Insureds when A&E Auto never purchased the specific Glass Parts and/or OEM glass.

97.     These knowing and intentional acts constitute a pattern of criminal activity, in that said acts constitute insurance fraud in violation of Ariz. Rev. Stat. §§ 20-463(A)(1)(a);    20-463(A)(5);    20-463.01(A)(1)(a);    20-463.01(A)(3);    and    20-463.01(A)(4)(a).

98.     This pattern of racketeering activity resulted in GEICO issuing payment for the reimbursement of thousands of claims that it otherwise would not have provided reimbursement for.

9078113

99. Defendants' pattern of racketeering activity has caused GEICO to sustain damages of at least $1,900,000.00.

100. By reason of Defendants' conduct, GEICO is also entitled to recover threefold the actual damages it actually sustained, reasonable attorney's fees, and court costs pursuant to Ariz. Rev. Stat. 13-2314-04.

**FIFTH CAUSE OF ACTION**
**Against all Defendants**
**(Common Law Fraud)**

101. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 100 above.

102. A&E Auto, A. Solheim, and E. Solheim intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts in the course of their submission of fraudulent claims to GEICO for reimbursement.

103. The false and fraudulent statements of material fact and acts of fraudulent concealment include the misrepresentations that: (i) A&E Auto performed Glass Services to the Insureds, when such Glass Services were never performed in the first instance; (ii) A&E Auto performed ADAS Services to the Insureds by submitting ADAS Receipts containing the Insureds' signatures, when the Insureds never signed such ADAS Receipts and the ADAS Services were never performed in the first instance; (iii) A&E Auto provided Glass Parts to the Insureds, when at least – if not all – of the Glass Parts were never provided in the first instance; (iv) A&E Auto provided OEM glass to the Insureds when such only Non-OEM glass was provided to the Insureds; and (v) A&E Auto purchased specific Glass Parts and/or OEM glass from automotive dealerships that was

9078113

THORPE SHWER, P.C.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

purportedly provided to the Insureds when A&E Auto never purchased the specific Glass Parts and/or OEM glass.

104.    A&E Auto, A. Solheim, and E. Solheim intentionally made the above-described false and fraudulent statements and concealed material facts from GEICO in a calculated effort to mislead GEICO and induce GEICO to pay for reimbursement claims that it would not otherwise have provided.

105.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,900,000.00 in the reimbursement of claims made by A&E Auto.

106.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

107.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**SIXTH CAUSE OF ACTION**
**Against all Defendants**
**(Unjust Enrichment)**

108.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 107 above.

109.    As set forth above, A&E Auto, A. Solheim, and E. Solheim have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

44

9078113

THORPE SHWER, P.C.

1
2
3
4
5
6

110.   When GEICO paid the invoices provided by the Defendants submitted for reimbursement, it reasonably believed that the Glass Parts, Glass Services, and specific type of windshield glass were provided to the Insureds based upon the invoices and the submission of additional supporting documentation such as the ADAS Receipts and dealership-invoices.

7
8
9

111.   Absent the misrepresentations by A&E Auto, A. Solheim, and E. Solheim, GEICO would not have issued the payment for the claims identified in Exhibit "1".

10
11
12
13
14

112.   Therefore, GEICO's payment of the claims submitted by the Defendants through A&E Auto resulted in the Defendants being unjustly enriched, as the Defendants received payment for claims they submitted to GEICO, which should not have been paid since the Glass Services and Glass Parts were never provided to the Insureds.

15
16
17

113.   A&E Auto, A. Solheim, and E. Solheim' enrichment was at GEICO's expense, as GEICO paid the Defendants, through A&E Auto more than $1,900,000.00 since late 2017.

18
19
20

114.   By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $1,900,000.00.

21

**JURY DEMAND**

22
23
24

115.   Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

25
26
27

**WHEREFORE**, Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. demand that a Judgment be entered in their favor:

28

45

A.     On the First Cause of Action against A&E Auto, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that A&E Auto has no right to receive payment for any pending bills submitted to GEICO;

B.     On the Second Cause of Action against E. Solheim and A. Solheim, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,900,000.00, together with treble damages, costs, interest and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c);

C.     On the Third Cause of Action against E. Solheim and A. Solheim, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $1,900,000.00, together with treble damages, costs, interest and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(d);

D.     On the Fourth Cause of Action against E. Solheim and A. Solheim, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,900,000.00, together with treble damages, costs, interest and reasonable attorneys' fees pursuant to Ariz. Rev. Stat. 13-2314-04;

E.     On the Fifth Cause of Action Against all Defendants, compensatory damages in an amount to be determined at trial but in excess of $1,900,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper; and

F.     On the Sixth Cause of Action Against all Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of

9078113

1  $1,900,000.00, plus costs, interest and such other and further relief as this Court deems

2  just and proper.

3

4          Dated this 4th day of March, 2019.

5                              **THORPE SHWER, P.C.**

6

7          By:  /s/ *William L. Thorpe*
                William L. Thorpe
8                Jamie Gill Santos

9          AND

10

11              Barry I. Levy (to be admitted *pro hac vice*)
                Max Gershenoff (to be admitted *pro hac vice*)
12              Steven Henesy (to be admitted *pro hac vice*)
                Michael Vanunu (to be admitted *pro hac*
13              *vice*)
                **RIVKIN RADLER LLP**
14

15              *Counsel for Plaintiffs, Government Employees*
                *Insurance Co., GEICO Indemnity Co., GEICO*
16              *General Insurance Company and GEICO*
                *Casualty Co.*

17

18

19

20

21

22

23

24

25

26

27

28

THORPE SHWER, P.C.

9078113

## CERTIFICATE OF SERVICE

I hereby certify that on March 4, 2019, I electronically transmitted the attached document to the Clerk's office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the CM/ECF registrants.

_/s/  Rebecca Camelio_

THORPE SHWER, P.C.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

9078113